Good afternoon. Our case for argument this afternoon is USA Gymnastics v. Liberty Insurance. Mr. Schiller. May I remove the mask for the argument? Yes, please. Good afternoon, members of the panel. I've reserved five minutes for rebuttal, if that's all right with the panel? That's fine. Just watch your clock. Yes. We're here today principally because our position on behalf of Liberty is that the so-called Thompson presumption should not have been applied by the bankruptcy court and then by the district court to the fees that were being demanded by USA Gymnastics. To be clear, we spent a disproportionate amount of our brief, as did USA Gymnastics, addressing whether or not the facts supported the presumption or not. I'm going to talk to you as much as I can about the facts that I don't think are in dispute that show that the presumption, which USAG refers to as emanating from Thompson, but to be clear, this court has held that this is a federal standard because it's a procedural issue, not a state standard. I thought the procedural aspect of that was simply having to do with whether you have to have a hearing, not with the substantive standard for awarding attorney's fees. In Medivante and Taco Bell and going back, I believe, Your Honor, all the way to the Baker case, all of the cases have applied it to determining that the standard gets shifted, the presumption gets shifted. That sounds pretty substantive to me, almost a burden of proof. I must admit I agree with you on that, but those federal cases said clearly this is a procedural issue and it is a burden shifting. That's substantive, I agree with Your Honor, but those cases say the opposite, and I only raise that to the panel because to the extent Thompson adopted those cases and said we agree with the reasoning of the Seventh Circuit cases, okay, we can look at the Thompson factors as flowing from the federal cases, but this is not what Your Honors are used to hearing, which is a diversity case before Your Honor, where we're following the law of Indiana and Thompson declares the law of Indiana and that's the beginning and the end. And by the way, as I know Your Honors know, Thompson was an intermediate state court case anyway, but I'm not sure that makes a fundamental difference here except that Thompson does add one thing that the other six federal cases do not. The other six federal cases do not cite Rule 1.5 of the Indiana Rules of Professional Conduct, and that ended up becoming the subject of substantial USAG briefing where they say their expert did better in following Rule 1.5 than our expert did, their expert being Mr. Schoon and ours being Mr. Cooper. Mr. Shiller, before you dig more deeply into this, could I ask you, in light of the filings of the last few days, to identify for us in your view what is still in dispute between the parties? The presumption issue is still in dispute, and that's the major issue here, Your Honor, and that issue therefore affects everything else here because it's not true, for example, that we paid an amount of money that was undisputed, and that is what USAG has characterized it as. I'm asking you to tell me what is in dispute. As I understand it, it's about $458,000 plus interest. That's correct. Yes, Your Honor. Okay. Are there particular elements of that as to which there are specific challenges short of the Thompson presumption? Oh, all of that would be affected by the Thompson presumption, so yes. What if we disagree with you about the Thompson presumption? Then what do we do? Well, the Thompson presumption has two pieces to it, as I know the panel knows. One is does the presumption apply, and two is if it does apply, are there special circumstances that derive an exception to the otherwise applicable? Yes. I'm trying to get you to be specific. Okay, as to those special circumstances and as to those bills. As to pieces of the $458,000 that need to be addressed, in your view, if we were to find that the Thompson presumption was appropriately invoked? Yes. And your argument is maybe we've rebutted it, or you think you have. No, there are three pieces, and I was just about to say the third. But the first is the presumption, qua presumption. The second are, are there special circumstances which really go to rebutting the presumption in whole or in part? And the third is, notwithstanding the presumption, do we have evidence that rebutts any part, in whole or in part? And it doesn't have to be the whole. Yes, I understand those are the broad legal issues. Could you be specific? For example, are we talking any more about Gibson-Dunn's bills? Yes, and that's where I was about to go, Your Honor. Clearly the presumption doesn't apply after they make their deal, but the district court found that their bills were reasonable anyway. So that would be one issue that needs to be addressed. Yes. We're talking about the Gibson-Dunn bills, the Jenner and Block bills, the Miller-Johnson bills. Miller-Johnson, Your Honors will recall, was the National Coordinating Council firm that had started. It was Schneider's firm. Schneider's firm, where he was basically approving his own bills even when he said he had a conflict and couldn't do it, and they had no other procedures. We're talking about the Hilder bills, and we're talking about all of the law firms. Okay, wait a minute. You're telling me everything's still in dispute. A part of everything is still in dispute, yes, Your Honor. In other words, when we paid 1.4, we didn't take X law firms and say, we're agreeing they're all owed now, but these other law firms' bills are still in dispute. We paid an amount of money, and I'd be happy to discuss that with Your Honors if you want me to, but we did not segregate it by type of bill, Your Honor. So this deal has not – your payment does not remove any issue from this deal as you see it? That's correct. Okay, that's helpful to know. Okay. Why don't we talk about that payment? Liberty believes it was an error to apply the presumption of reasonableness, and that error infected the legal judgment. Why pay the 1.4 million? We had posted a bond, as you know. This case is an unusual case in that normally when the insured sues, it sues both for a declaration of our duty to defend and for an amount it says we owe. And when they filed a motion for summary judgment early on in the day, I mean USAG, they did not get a judgment on any amount of money. And the bankruptcy judge, Judge Moberly, so held. The district court judge, Judge Young, so held. Nobody has ever held that they got a judgment for a specific amount of money, and their conduct shows that because what they did later is they separately moved for a money judgment a year or some time later. So the reason I'm telling you this is that we didn't get a money judgment that we could post a bond for, appeal, bring before your honors until October 7, 2021. And that was a Rule 54B money judgment. And that topic did arise in our first oral argument here. That's good. Well, there was a question that arose in the first argument. You're right. That had to do with what had we paid and what hadn't we paid. But where I'm going on this, your honor, is normally all the issues would have been at the same time. And we would have had a chance to raise any fact issues as to the amount at the same time. What happened here instead is that they moved for a judgment that we breached the duty to defend. There was no finding on the $1.4 million they were then seeking. And in a reply later, when we raised an issue about that, when they tried to later raise it, they responded in a reply brief with four declarations or affidavits, which they said supported the calculation of the $1.4 million. We said, foul. We want to take discovery. Keep in mind there had been no Rule 16 conference or Rule 26 conference. They started this with a motion for summary judgment. So what changed? Well, because these cases weren't together, your honor, when the two parts of it weren't together. I know USAG says they were, but no judge has agreed with them on that. Because they were separated, we had two parts going on. And, yes, when your honors ruled in late February that we did have a duty to defend, we had to reassess. And on March 31st, when our petition for re-argument was denied, we had to reassess and decide that because the duty to defend was held to have been breached, March 31st was the date that the petition for re-argument was denied, and because our position was that the $1.4 was a ceiling, and Judge Mobley so agreed, and so did Judge Young, but obviously there is some amount, as inscrutable as it is for us to determine or not. So we made a decision to make a payment subsequent to the March 31st denial. That was, what, six weeks ago. Shiller, can I ask you about a couple of the specific issues presented here? I may have missed it in your brief, but Judge Mobley, in deciding to apply and find unrebutted the Thompson presumption, relied at least in part on the fact that USA Gymnastics was in bankruptcy during at least most of these years, and so that other creditors, the U.S. trustee, and so on, did not take on the reasonableness of the fees that USA Gymnastics and the other creditors, and its other creditors, had to assume they were going to have to bear. I didn't see that. Did I miss that in your brief? Your Honor, she said that because of its bankruptcy status and its 501c3 status, it had every incentive to want to minimize costs. The problem with that is there is, and one, none of the six cases or Thompson take that into account or say it should matter to your Honor. Well, why should they have? There's no indication that that was relevant there. And yet, if you were looking for market testing and, in essence, independent scrutiny of the reasonableness of fees, I would think the U.S. trustee is not a bad place to look. This is a different kind of bankruptcy, though, than you're normally thinking of, Your Honor. This is not GM going into bankruptcy that has substantial trade creditors. This is USA Gymnastics, which went into bankruptcy in order to channel the tort claimants. So the tort claimants were, I mean, that's the 800-pound gorilla. I mean, the creditors were the tort claimants going after insurance policies that covered their tort claims. They weren't going after coverage or worried about coverage for investigations that would or could result in a change of USAG's behavior. So this is not that kind of bankruptcy, Your Honor. And by the way, none of those creditors had access to or looked at those bills. None of the creditors that mattered here. What about the trustee? I don't know if the trustee did or not. I doubt it, but I don't know. It's the trustee's job, right? It's a trustee's job in a trade creditor situation. You're absolutely right, Your Honor. But I'd have no reason to think that happened here for another reason, which we mentioned in our brief. And that's NGF, National Gymnastics Foundation. Yeah, that was my next question. Tell me why that should redound to Liberty's benefit rather than USAG's. Well, it's already redounded to USAG's because National Gymnastics Foundation or NGF paid some $7 million or $8 million, most of which was earmarked solely for defense costs. The reason that we respectfully contend that it should benefit us on the Thompson, I'll call it that, presumption, is that it completely takes away the motivation. I mean, the whole presumption is founded back to 1996 on the assumption that the person, the company paying the bills had no assumption of being repaid. It was paying money that would otherwise spend on needed expenses. It had an in-house attorney who was professionally obligated to do his job to protect the creditors, and if it's a public company, the shareholders. And NGF has nothing to do with any of that. NGF was a source of unrestricted funds solely to pay defense costs, Your Honor. Right. But the problem I have is if a third party steps forward to help, why should that work to the benefit of the party in breach? They found the victim of the breach finds independent funding somewhere because they're in bankruptcy, et cetera. I keep calling it the Thompson presumption, but for the reasons we talked about, it could just as well, and before now I've heard it referred to as a Taco Bell presumption, which was the Seventh Circuit case. But in any event, Your Honor, because the whole purpose of a burden-shifting presumption, and let's make no mistake about it, it is substantive. It makes a huge difference. The whole purpose of a burden-shifting presumption is that it's an artifice used to make the party that's defending against the prevailing party rebut something that otherwise the prevailing party has the burden of establishing. In every case, the prevailing party, in this case USAG, has the burden of establishing that the costs were reasonable and necessary. It's in our policy, but it's a standard term. But why wouldn't the collateral source principle that Judge Hamilton is referring to apply across the board, whether the reasonableness and necessity is established by way of the Thompson-Taco Bell presumption or by virtue of a more traditional line-by-line scrutiny of the bill? Collateral source, and I understand where Your Honor is coming from, is a little different, though. Collateral source is if you've recovered from another insurer or somebody who has a separate obligation to you, you can't take that into account. It's broader than that. It also applies to other third parties who step up to help, in Judge Hamilton's terminology, or write-downs in fees. It customarily applies to that in the medical context. Correct. The difference here, Your Honor, is, again, it's a presumption. It's not a rule of evidence. It's not a you-don't-get-to-put-in-front-of-a-jury, the collateral source of funds. The collateral source doctrine is part of the measure of damages. It's not a rule of evidence. Yeah, well, okay, measure of damages. In the old days, we used to use it to refer to molding the verdict after a trial. In other words, the jury doesn't hear it, but it could be relevant in some jurisdictions to molding the verdict. But the whole point of this, Your Honor, is this is not a reduction of damages. Your Honor said it right. This is instead shifting the burden solely because there is a supervision and payment. Well, no, the attorney's fees here are the damages for the breach of the duty to defend. Correct. We're talking about a measure of damages here and how it's proved. And that's why it makes it a little hard to think about which parts of this inquiry are substantive and which parts are procedural. Because these are damages. This isn't a fee-shifting statute where we're just focusing on attorney's fees. This is the measure of recovery for the breach. Agreed, Your Honor, although damages are substantive. I mean, in the law of every state. I get it. I'm with you. But where I'm going, Your Honor, is that this is not whether or not either whether it's an evidence matter, does the jury get to hear about the collateral source of recovery, or does it reduce damages. That's not what this is. This is instead saying we're going to apply a presumption, and it's a very high hurdle presumption. We're going to apply a presumption for two reasons and two reasons only. Not only was there a breach. That's given. But in addition, the defendant doesn't get an opportunity to, as USAG puts it, go through the bills or nitpick or demand a degree of certainty that they want because the insured is presumed to have paid market-tested figures. Why market-tested? Because it's supervised and because it paid them. Neither is true in whole or in part here. And the reason I say in whole or in part is, as we all know, and I won't repeat what you read, but you have Gibson-Dunn of some $400 and some thousand, which said we will only take recovery from the insurers. That's exactly the opposite of the basis for the presumption. With Gibson-Dunn, when they make that deal, that clearly takes it out of the presumption. But we have the alternative finding on their fields. They're reasonable on their own terms, right, from the district court. What we have from the district court is that Mr. Schneider said that they were reasonable because the insured looked them over. We have a district court factual finding that the Gibson-Dunn bills were reasonable, correct? Yes, but applying the wrong rule, Your Honor, and that's de novo. And what I mean by that is what they said is because Gibson-Dunn had reviewed its bills and promised that it was going to provide the best bills it could, and the federal case law says, no, it has to be a review by the payer, the insured, not Gibson-Dunn. So yes, Your Honor, there was a finding, but it was based on undisputed testimony that Gibson-Dunn said it had reviewed its bills. And that's a legal issue, Your Honor. And so I very most respectfully push back a little bit on the assumption that that's… So it's a clearly erroneous factual finding in your view? Well, the clearly erroneous factual finding would be if they're reasonable. Yes, that's the finding that was reached. But on a wrong assumption, which is not clearly erroneous. The wrong assumption being that it's relevant that Gibson-Dunn reviewed its own bills. That's what I'm trying to say, Your Honor. I'm sorry if I'm not being as clear as I should be. The other point, of course, is the conflict. And the conflict that Miller Johnson had where Mr. Schneider said, and this is not insignificant, his bills were a few hundred thousand dollars of what was being pursued against us. But what he said, I have a conflict. And yet he also testified undisputed that USAG's, I think I'm almost out of time, but USAG's senior people employed the same procedure. No differences were made. No one reviewed the USAG, I'm sorry, the Miller Johnson bills. And I don't want to use up my time. But the only other thing I will tell you is we did say that notwithstanding the presumption and the exceptions to the presumption, there's also a problem here when the bills are inscrutable. And we can get into that later, but I didn't want to be accused of saving it and sandbagging it because it's an important part of our argument. Actually, your time has completely expired, but we have a lot of questions for you, so I will give you some more time. Okay, now or later? I'll give you more time in rebuttal. Okay, thank you. Okay. Thank you. Mr. Gottwald.  May it please the court. In preparing today, I was thinking about the old adage of when the law is on your side, hammer the law, and when the facts are on your side, hammer the facts. And I feel like USAG has both on its side here, and so I want to talk about just a couple. And those are the – while the presumption applies, there was a trial. Regardless of the presumption, there was a trial, and USAG won on the trial. And so I would like to talk about those two things, particularly that they won on the trial. And both the bankruptcy court and the district court both found USAG's expert more credible, more reliable. There's lots of good evidence in the record to support that. And with that evidence, it can't be clearly erroneous. That's a high standard. And then the second item I'd like to talk about is the presumption that we talked about. And that's here – it's important to note that this is an insurance case. It's not a federal fee-shifting statute. It's not even an indemnity provision in a contract where it's a side provision after – the duty to defend is a material – And an investigation doesn't lead to a bunch of damages. What you need is the defense. And when you have that breach, when you have that breach, that's an important factor. And as the court has said, Taco Bell, Ann Thompson, market incentives – and it's wholly unfair when the insurer makes that breach of that important part of its policy that this presumption should apply. On the market incentive question, it looks like the figure that's been offered is about 70% was paid. At what point does it not become market? Is 70% enough? Is 50% enough? Or do you have to have 95% to make sure it's market? Very fair question. I think 70% is pretty substantial. I think what we have here – again, payment isn't required. Payment is evidence of market incentive. And so that's not really a question we have – I don't think that the court would have to decide here because not only do we have payment on a substantial portion, we have – what Taco Bell and Thompson both said was incurring the fees without guarantee of payment. That is market incentive. And beyond that, payment – I want to say several of the Seventh Circuit cases have said payment is market rate. That's not evidence of it. It is that. So I don't think that that's – 50%? Probably. You start to get below that, then maybe there's a question. But here we have 70% payment. And then you start breaking it down to what has been paid and what is remaining at issue. And, I mean, it is – There would be some concern in such cases, Mr. Codewald. In the abstract, at least, there may be some kind of side deal. We'll bill you at 100% of our rates, but we really only expect 70%, for example, or something like that. There's been nothing like that in this record. But I wonder if it would be appropriate to think about the partial payment issue, in essence, as part of the facts that support or discourage use of the presumption. I think that's a fair point, Judge. If you were down to 20%, it would carry a lot less weight, right? Agreed. And I think something like that, Your Honor, Medevante talks about, and opposing counsel has raised what I think aren't fair special circumstances. But there are special circumstances that could come in and overrule and override that presumption. And that is a perfect example of one. Now, I don't think that the points that have been raised actually are special circumstances here. Mr. Codewald, could you address specifically the role of Mr. Schneider? That does seem unusual and not something that is addressed in the case law that I've seen. Absolutely. So, taking a step back, you have to realize where USAG was and what it was going through. Its entire management structure was gone. And they needed someone involved to oversee all of this litigation. And so they engaged Mr. Schneider, who had been intimately involved with everything that was going on prior to that, to serve as its outside chief legal officer. Now, when they did that, they recognized the potential issue of, hey, we can't have just the chief legal officer signing off on their own bills. They raised that. It's in the fee agreement. There were discussions with the CEO about it. And that was the process. Now, Mr. Schiller takes issue with the process that USAG went through. And I think we went on that point, that there was absolutely adequate supervision here. I think the trial court found that factually. I don't think they've raised a clearly erroneous standard to overcome that factual determination that there was adequate supervision. And I'm happy if the court would like, as a part of your question, to go into what all that supervision was. But it's also in our brief, I thought, on pages 42 and 44. But you still have the bills cannot be paid to Miller Johnson without the CEO giving it the okay and the CFO. Now, Mr. Schiller said that, well, there wasn't enough supervision there because there's not documentation. But Mr. Schneider also testified that he was having discussions with both the CEO and the CFO about the bills. Do we have relevant case law about such insured-insurer disputes on a breach of a duty to defend that have involved an insured in bankruptcy? Or is this unique? Oh, going back to your earlier question about is there a market check of the bankruptcy? I'm not aware of any of the cases that the courts have dealt with presumption where bankruptcy is also in play, no, Your Honor. And I do think that, to your questions earlier, that it does add an added layer of market incentive, market protection. Because I can tell you the trustee was involved and did look at the fees. Is that developed in the trial record? In the bankruptcy court proceedings, I think there's transcripts. I don't think in the appendix, though. Not everything. We have access to the record, not limited to appendices, which we sometimes try to tell appellate lawyers. Not everything has to be in the appendix. I understand, Your Honor. Okay. So you're relying on the CFO and the CEO's check on Schneider for sufficient supervision on the Miller-Johnson bills? Well, it is not. I'm sorry. And what else? It is not just that. Remember, Mr. Schneider is an attorney bound by his ethical obligations of Rule 1.5. That's a pretty good check, I would think, as well. And could you address, I confess to being a little confused or at least vague about the time sequence on Gibson-Dunn. They were billing, and you guys were paying a substantial part of their fees, and then there was the deal to say we'll look only to the insurers, right? Yes. Do you agree that that deal removes the Thompson presumption going forward from that point on the Gibson-Dunn bills? Actually, I do not, Your Honor. Why not? It does remove the USAG's perspective of expectation that it would be paid. But there's other evidence in the record that Gibson-Dunn still had incentives to keep its bills in control, and one of those is that Mr. Schneider continued to review them. And I know the response to that would be, well, why would he care? Why would he care? He's not paying for it. But you've got to remember, he's coordinating counsel, and so if Gibson-Dunn is off doing something wrong, that means somebody else that they're paying for has got to step up or correct that or address that. There's also, in the record, there's the evidence. That's not going to be his primary concern, though, with Gibson-Dunn, right? Agreed. I would agree with that. But in addition, there's also the fact that the structure was in place, setting the rates, setting the work. All of that was already in place. None of that changed. Rates didn't change? No. It wasn't a, well, now that we're going to do this deal, we're going to remove the discount that we had. That was already in place. I would have thought that might actually have been reasonable, given the risks that we're taking. I would say what it is, it's further evidence of USAG supervising the bill to try and minimize its costs. This is what I think, what it shows the most. One of the other facts is, it wasn't raised in the brief, but it is in the record, that actually one of the other CGL carriers made a payment towards Gibson-Dunn as well. So not only do you have Mr. Schneider supervising these fees, you have another carrier that made, oh, I want to say it was about an $80,000 payment towards the Gibson-Dunn fees. So, again, another piece of evidence to show that there was market check on that. Can I clarify one further point in response to this new development in the last couple of days about the payment that's been made? Our remand in the earlier appeal on the limited issue of the third-party EPO limit, does that implicate any of the $460,000 or so that's left in dispute here? No, I do not believe it does, because those limits are outside, the defense costs are outside the limits of coverage in this policy. This is not a wasting policy. Okay, so it doesn't have anything to do with that component of the only remaining fees in dispute right now are not affected by that remand? Correct. Okay. Correct. Mr. Cadwell, do you want to address the relationship between the foundation's payments and the risk of nonpayment of the fees by USAG? No, absolutely, and thank you, because I did want to get to that point. I think it was alluded to that the foundation – a couple of points. One, you need to understand that USAG did not go get this grant to just pay these fees at issue. There are all sorts of other fees at issue in the bankruptcy case that it needed. It was struggling. It was way behind on its payments. For example, the fees of its bankruptcy counsel, which exceed a lot of this, those payments were made. Part of that grant was for those, and to me the grant is evidence of USAG under the strain of its fees and doing everything it could to reduce them and to actually pay some of them so it didn't have its professionals stop doing services. Because it wasn't able to afford them. And so what you have is you have the organization going to a collateral source to say we can't cover these fees, and it's not – again, it's not just the fees at issue. It are all the professional fees. The creditors' committee fees as well are in play here. Those were all legal fees that it had to – so it needed to get the money so it could make some payments towards that. So I don't see how that is a special circumstance that USAG was kind of, oh, we got all this money. We don't really care anymore about what our legal spend is. It absolutely was concerned about it. There's nothing in the record to suggest otherwise that USAG was concerned, and it was behind on a lot of these bills. You can see that in the monthly reports of the bankruptcy. Thank you. But we've talked a lot about where the presumption applies, but I'd like to bring it back to the initial point was the presumption here is a little bit academic. We had a trial. Now, we could talk about whether there was an entitlement to that trial because of the presumption or not. I tend to think no, there probably wasn't, but it doesn't matter at this point. There was. And the evidence was the factual findings was that USAG's expert was more credible, more reliable than LIU's. And I haven't heard anything or really read anything that overcomes that factual finding. Now, LIU seems to imply that, well, because there was the wrong standard that used by our expert, which they would claim is he shouldn't have done the total value, that somehow the judge was confused. But I don't think that's the case because, Thompson, what is a reasonable and necessary cost? That definition, that's something Thompson sets. I don't think the Seventh Circuit says what Indiana's law is on what is a reasonable and necessary fee. I think it allows it to say what evidence can show that. But that's Thompson that says that, which intermediate court, yes, but transfer was sought and upheld on this point. But you take the next step of we present our expert, we win. We don't have clearly erroneous evidence here. There just isn't any. We've got evidence in the record supporting the position. The total value is, that is the approach that Indiana applies. That is the approach that our expert applied. Now, they may not like that, but they didn't move to strike our expert. All of their complaints about Mr. Schoon are credibility complaints. They're credibility complaints. And as your honors know, when there are competing versions of the facts, that's a pretty high burden to overcome when that's been concluded. And so I don't see, and I struggle to see, how you get over what this court has noted that that standard is, the stench of five-day or five-week-old unrefrigerated smelly fish. It just doesn't exist here. Which makes the entire presumption argument academic. I think we qualify for it, but it really is just academic. And unless there are other questions, your honor, I will rest. All right, thank you very much. Mr. Schiller, your time had expired, but you may have five minutes in rebuttal. There's a lot to cover. Thank you very much. On the trial that occurred, Judge Mober was the best. Were those scare quotes? I'm sorry. What I meant was, your honor, there was an evidentiary hearing. It followed a period where we had expedited, truncated discovery. We were not allowed or permitted to take depositions of people who had written inscrutable bills. And when I say inscrutable, to be clear, I'm not talking about block billing, because block billing has sometimes been found to be okay in the right circumstance where the presumption applied because the insured was paying them and had an officer who was a lawyer and had responsibilities reviewing them. I'm talking about block billing with vagueness, with shortness, that gave you no indication of what the person was doing. I'm talking about an attorney at the Faygre firm who puts down e-mails, 2.9 hours, or puts down review e-mails, review media, 1.9 hours. This is not nitpicking. This is bills that have tens of thousands of dollars of simply inscrutable description. Mr. Shiller, how much did Mr. Cooper, how many hours or what were his fees for the work he did? I apologize, your honor. I don't remember. Part of it is I have worked with Mr. Cooper in one other case. I don't remember. I can't tell you. If I knew, I would tell you right now, but I can't tell you if his bill was $50,000 or $100,000. It's expensive, right? Not as expensive as Mr. Schoon, I assure you, but yes, he's not inexpensive. Do you know that? Yeah, I'm sure of it. Do you know that? Do you know what his fee was? Did you decide to find out what Cooper's fee was? Yeah, your honor, I don't recall. Okay. I don't. Then let's stick with what we know. Okay. But what concerns me, as our opinions in this area pointed out, is that the kind of process that Cooper went through and the kind of process you want the court to go through is an expensive, time-consuming one. And people, clients who can make rational decisions about whether they want to do that or not. Well, Chief Judge Sykes asked a question about what was left. And this happens to be a case, your honor, where we have the third-party EPL issue, which could mean that this is a $250,000 liability limits case. Or it could mean that it's a $5 million case. But, your honor, we can fight long and hard about that. But, in the end, as Mr. Gottwald was starting to suggest, on a duty to defend policy with defense outside our limits, we're talking about sums that are greater than the limits of the policy, whether it's $250,000 or $5 million. So, if the presumption applies, yes, your honor, I agree with you. We spare the parties and the court those costs. But if the presumption doesn't apply, then the policyholder has the obligation for pursuing its millions of dollars to show reasonableness and necessity. And we do it all the time, your honor. I mean, so that the answer that it requires more work, I agree with you. But we're not talking, yes, now we have about a half a million left here. But normally, and even here, we're not talking about $50,000 or $150,000. They are seeking, and you heard that, and have sought millions of dollars. We just made a payment of $1.4 million. No, $1.6 something, including interest. But, your honor, the reason that I brought this up was one of you asked a question. And Mr. Gottwald answered saying, you know, there was an evidentiary hearing, so it doesn't matter. Except that as a result of that evidentiary hearing, Judge Mobley wrote an opinion, and she rejected problems that we thought were undisputed and indisputable. In terms of major categories of problems with bills on the ground that the presumption said you don't touch them so long as the presumption applied. So that she did not address whether or not block billing or inscrutable combined block billing and vague entries, or for that matter, sending six or ten lawyers to prep a witness, the majority of whom had never had anything to do with the case before. Can I ask you about that? Yeah. You're talking about the congressional hearing, right? Yes. The prep. Now, you may or may not realize, but all three of us have appeared before Congress. And the prep session involved a whole room full of people to get different impressions, to bring people new to the issue, or to the person, to kind of provide reactions. Much the way a law firm might do a moot court for an appellate argument, where you bring in some folks who don't know the case, right? I've done that, yes. Yeah. We all have. So why is this different? What was different here, Your Honor, and it wasn't once, it was numerous times, is that they brought in people who had no connection to the case, had not billed in advance to preparing for this prep session for the congressional hearing or anything like that. Because at least, I assume, in your experience, frankly, in my own, everybody who's involved gets prepped for it. They review materials. They put time into it to make something out of it, to get the most out of this meeting in a conference room. They each have a role to play. They're not bringing in four or six people who never billed any time in advance of that meeting, never billed any time after the meeting, to just descend onto the room and sit there and add whatever, I guess, intelligence they can add for the day. That's not the kind of prep session I think you're thinking of. And that's one of the things that Mr. Cooper complained about. But my point, Your Honor, is this was an evidentiary hearing, granted. But Judge Moberly didn't even take into account indisputable evidence, evidence that had to do with things that didn't just go to should the presumption apply. But even if it does apply, nobody could have done his job, if you were Mr. Schneider, and looked at these invoices and approved them. Because I'm not saying that the total amount he couldn't ask questions about or he did ask questions about. I'm saying that they might as well have stuck a few pages of the phone book in between the cover and the back end of this invoice because he couldn't have understood them. And Your Honors read in our brief that he never questioned the bill. He said he looked at them only so that he could have a role in deciding the future message to the law firm involved. And as to the CEO and CFO, one of them said she occasionally flipped through a bill and the other one just did what Mr. Schneider told her. And just one other comment, Your Honor. The notion that Mr. Schneider has an obligation under the ethical rules to not, I guess it is, to treat his client according to the rules when he's conflicted out, that makes no sense. I mean, we don't say that because somebody is an officer of the court that their conflict doesn't matter. If you have a conflict, then you can't hold up the rules as protecting what you're doing. And he acknowledged this conflict. He said so. There was no question about it. No case, not one of the six cases that preceded Thompson in federal court and not the Thompson case, has ever upheld the presumption where there was a substantial portion that was essentially allowed only against an insurer where the policyholder had no incentive to look at them or reduce them and where counsel was conflicted. And just for clarification, the EPL sublimate litigation on remand does not implicate this residual basket of fees that are still in dispute. It doesn't, Your Honor. It doesn't at all. I agree with Mr. Gottlieb. Thank you. All right. Our thanks to both counsel, to all counsel. The case is taken under advisement and the court will stand in recess.